IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TIMOTHY LAMBROSE,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:13-CR-556-TC |

Defendant Timothy Lambrose has been indicted on one count of possession of an unregistered sawed-off shotgun. Mr. Lambrose filed a motion to suppress evidence seized during a December 13, 2012 nighttime search of a house in West Jordan, Utah, his arrest (Mr. Lambrose was a fugitive at the time), and subsequent statements he made.

The court finds that the officers' warrantless entry into the house's curtilage was not justified, that the officers did not establish a reasonable belief that Mr. Lambrose lived at the house or was at the house at the time the arrest warrant was executed, and that the officers did not properly inform Mr. Lambrose of his Fifth Amendment rights because the delivery of the <u>Miranda</u> warning was flawed. For these reasons, Mr. Lambrose's Motion to Suppress is GRANTED.

**FACTUAL BACKGROUND**[1]

On July 13, 2012, an arrest warrant was issued for Defendant Timothy Lambrose, who was on probation with Adult Probation & Parole (AP&P) and had disappeared in violation of his probation agreement. Mr. Lambrose, who was on probation for Assault on a Police Officer and Resisting Arrest, had been a fugitive for approximately six months.

AP&P Agent Brittney McIntyre was assigned to the AP&P fugitive unit as well as a joint task force called the Joint Criminal Apprehension Team (JCAT). On December 12, 2012, Agent McIntyre received an e-mail from Jeremy Shaw, the supervisor of JCAT, providing a tip on the whereabouts of Mr. Lambrose. In the e-mail, Supervisor Shaw provided the following information:

> **Subject: Misdemeanor Probation Fugitive Timothy Lambrose (offender #191740) USE Caution**
>
> Received info from Bailbondsman that Lambrose is carrying .40 cal handgun (according to offender's brother Alex). Lambrose is <u>possibly staying</u> at his brother Alex's home at 7560 South 2167 West, WJ [West Jordan, Utah]. . . . This particular bondsman provided good intel in the past . . . .

(Gov't Ex. 2 (emphasis added).)

After Agent McIntyre received the e-mail (the "first tip"), she looked up information on Mr. Lambrose on the law enforcement agencies' databases. "I looked at his arrest history, what his behavior was when he was arrested, I searched his family members in our system to find out what information I could find on them, I searched vehicles, what information I had on previous

---

[1] The facts are taken from the testimony and evidence admitted during the court's October 22, 2013 evidentiary hearing on Mr. Lambrose's motion to suppress. (<u>See</u> Oct. 22, 2013 Evidentiary Hr'g on Def.'s Mot. Suppress (Docket No. 21).)

vehicles he may have driven, I ran him for warrants." (Transcript of Oct. 22, 2013 Evidentiary Hr'g (Docket No. 21) ("Tr.") at 11.) But she did not follow up on the information in the first tip.

Soon after receiving the first tip, Agent McIntyre received a telephone call from someone in the AP&P fugitive unit who relayed information received from an anonymous tip (hereinafter, the "second tip"). According to Agent McIntyre, the anonymous tip contained "the same information that is in the e-mail, but [the anonymous person] also said if a <u>certain vehicle</u> is at that residence, then he [Mr. Lambrose] <u>will likely</u> be at that residence. If the vehicle is not there, then he's not there." (Tr. at 13 (emphasis added).)

Agent McIntyre's investigation was very limited, as is the investigative record before the court. For instance, the record does not contain any information describing the "certain vehicle." Agent McIntyre did not run a license plate check to determine the name of the car owner. She also did not research the name of the house owner. She did not determine the name of the bail bondsman or speak directly to him. She did not speak to the anonymous tipster.

Nevertheless, Agent McIntyre planned to present the information she had on Mr. Lambrose at a JCAT briefing the next day. She testified that "when we have an assigned JCAT night, then I bring the information to a briefing which we hold before we start our night" looking for fugitives. (Tr. at 13.) December 13, 2012, the day after the first and second tips came in, was an "assigned JCAT night."

On December 13, 2012, about 9 o'clock at night, Agent McIntyre drove past the house identified in the first tip. "I observed that lights were on and that the vehicle that was reported was in the driveway. I felt at that time that I had enough information to know that [Timothy Lambrose] was there." (Tr. at 14.) She then asked a JCAT officer to watch the house until the

3

other JCAT officers arrived. She wanted to make sure that "the vehicle didn't leave" while the JCAT officers were being briefed. (Tr. at 15.) Nothing happened at the house during the surveillance.

At the briefing, which was held about 11:00 p.m., Agent McIntyre relayed information that Mr. Lambrose "was in possession of a handgun, that he was living with family members at this house, and that the vehicle that was reported was also at the residence and that lights were on." (Tr. at 15.) She circulated a photograph of Timothy Lambrose.

When JCAT officers arrived at the house (there were about ten to twelve officers, although the exact number of officers was never clarified on the record), the "certain vehicle" was still in the driveway and lights in the house were still on.

The JCAT officers, including Agent McIntyre and Supervising Deputy United States Marshal James Phelps, surrounded the house. They communicated with each other on radios and each officer could hear whatever was said by fellow officers. Some went into the backyard to make sure that no one escaped.[2] The backyard is surrounded by a chain link fence with a gate and a cinder block wall. (See Def. Exs. B-D.) Deputy Phelps and Agent McIntyre, along with

---

[2]The United States suggests that the officers were making a protective sweep, and so the warrantless entry into the backyard was legitimate. A warrantless protective sweep is limited to a cursory visual inspection of places where a person might be hiding. Maryland v. Buie, 494 U.S. 325, 327 (1990). Such a brief search is justified when the officers reasonably believe, based on specific and articulable facts, that there is a threat to their safety in connection with an in-home arrest. Id. at 336-37. The record here does not show such a reason for concern. Deputy Phelps testified on the witness stand that the officers who entered the backyard were following protocol used during the execution of fugitive warrants. Their purpose was to prevent the escape of any person inside the home. (See Tr. at 20-21.) They were not there to check for the existence of weapons or other individuals in the yard. Indeed, the officers had no reason to believe that someone was hiding in the backyard when they first approached the house. They were concerned with individuals inside the house.

4

four or five other officers, went up to the front door.

They identified themselves as police officers, yelling loudly and knocking on the door repeatedly for about five to ten minutes. But no one came out.

Deputy Phelps checked the front door, which was unlocked. He opened the door but did not cross the threshold. He yelled into the home, saying "Police. Come on out." (Tr. at 85.) A dog was barking inside, near the door. Deputy Phelps did not feel threatened by the dog, but, to rouse whoever was in the house, he yelled, "Look, I don't want to have to shoot your dog. Come on out now." (Id.) Alex Lambrose (Timothy Lambrose's brother) appeared in the front room and came out on to the porch, where he was taken into custody and questioned about the location of his brother, Timothy.

In the meantime (before Alex Lambrose came out), one or more of the officers in the backyard reported on the radio that they saw two males in the house, one on the main level and one in the basement. While the officers were still knocking on the front door, an officer in the backyard looked into the house through a sliding glass door and could see stairs leading down to the basement. The only way to see through the door was to go into the fenced backyard.

After Alex Lambrose was repeatedly questioned (he was reluctant to tell them where his brother was), he finally said that Timothy was in the basement. At that point, Deputy Phelps went into the backyard, opened the sliding glass door, looked inside, and saw Mr. Lambrose at the bottom of the basement stairs. Deputy Phelps, who was just outside the doorway, used the door frame for cover and ordered Mr. Lambrose to come upstairs. As soon as Mr. Lambrose reached the main level, he was pushed out of the house by Officer Addison who was already in the house. Mr. Lambrose was taken into custody.

5

Agent McIntyre took Mr. Lambrose to the truck of her partner, Detective Levi Hughes. In Detective Hughes' presence, Agent McIntyre recited the Miranda warning from memory and left out the crucial right to have counsel present during questioning.³ Agent McIntyre then questioned Mr. Lambrose, who admitted to possession and knowledge of two guns and ammunition located in the basement. Deputy Phelps and another officer searched the basement and found the weapons and ammunition, including a sawed-off-shotgun.

Mr. Lambrose now moves to suppress the gun and his statements to Agent McIntyre.

**ANALYSIS**

Mr. Lambrose contends that his Fourth and Fifth Amendment rights were violated because the officers illegally entered his house and questioned him.⁴ First, he argues that the officers who went into the backyard (i.e., curtilage protected by the Fourth Amendment) without a search warrant did not have a reasonable belief that Mr. Lambrose lived at the house or that he was present at the time the arrest warrant was executed. Consequently, he asserts, their actions were illegal and the evidence they obtained must be suppressed. Second, he argues that he did not knowingly waive his Miranda rights and so his statements are inadmissible.

---

³On the witness stand, Agent McIntyre was asked to recite the warning from memory, and this is what she gave: "You have the right to remain silent, anything you say can and will be used against you in a court of law -- um, um, you have the right to an attorney, if you cannot afford one, one will be -- um, one will be given to you. Do you understand these rights -- oh, do you understand these rights -- do you understand these rights as I have read them to you." (Tr. at 34-35.) That recitation left out the right to have counsel present during questioning. Accordingly, the Government concedes that Mr. Lambrose did not receive a complete recitation of his Miranda rights.

⁴Mr. Lambrose, as the United States concedes, has standing.

**Illegal Entry**

Mr. Lambrose contends that as soon as the officers went into the fenced backyard without a search warrant, they violated Mr. Lambrose's Fourth Amendment rights because the backyard is part of the house's curtilage. The United States Supreme Court regards "the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)); see also United States v. McDowell, 713 F.3d 571, 574 (10th Cir. 2013) (same). Consequently, an officer needs either a search warrant or a valid reason to enter the curtilage without a warrant.

The court must consider four factors to determine whether the area falls within the house's curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987). The fenced backyard clearly falls within the house's curtilage in this instance. Here, the small backyard, which contained children's toys and a barbecue (see Def.'s Ex. E), is completely enclosed by the back side of the house, the cinder block wall, and the chain-link fence with the gate. Under the foregoing circumstances, the court concludes that the officers entered an area protected by the Fourth Amendment.

Because, as discussed below, the officers did not have a search warrant or a reasonable belief that Mr. Lambrose was residing at the house or was in the house at the time of the entry (both of which needed to be established by the United States to justify entry into the house and

backyard), they violated Mr. Lambrose's Fourth Amendment rights.

Without a search warrant, the officers' authority was limited. They did, however, have a valid arrest warrant,[5] and "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980).

Based on the rule announced in Payton, the Tenth Circuit Court of Appeals established a two-prong test to determine the constitutionality of the officers' entry based on an arrest warrant. "[The] officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry." United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001) (citing Valdez v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999)).[6] The "reasonable belief" test is objective and requires a level of knowledge that falls somewhere below the "probable cause" and "reasonable suspicion" standards. Valdez v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999); Gay, 240 F.3d at 1227 ("To satisfy the Payton test the officers must have a 'reasonable belief' the arrestee lives in the residence, not a 'reasonable suspicion' necessary to justify a 'stop and frisk' under Terry v. Ohio, 392 U.S. 1 (1968).").[7] The court must

---

[5]Mr. Lambrose does not challenge the validity of the arrest warrant.

[6]In Steagald v. United States, the United States Supreme Court held that in order to execute an arrest warrant at the house of a third party (i.e., not the arrestee), the officer must have a search warrant absent exigent circumstances or consent. 451 U.S. 204, 205 (1981). But, as has been explained in other decisions, the Steagald standard does not apply if the officer reasonably believes that the suspect lives in that house. See, e.g., United States v. Thompson, 402 Fed. Appx. 378, 382, 2010 WL 4780366 (10th Cir. Nov. 24, 2010) ("Whether Steagald (third-party's home) or Payton (suspect's home) applies is resolved under the first prong of the Payton test.").

[7]Mr. Lambrose advocates for a holding that the "reasonable belief" standard is equivalent to the probable cause standard. (See Def.'s Mem. Support Mot. to Suppress (Docket No. 24) at 25-26 (preserving argument for appeal).) Because that is not the rule in the Tenth Circuit, the

8

look at all of the circumstances. Valdez, 172 F.3d at 1226. "The officers' belief need not prove true in fact[;] it is sufficient if the belief was objectively reasonable at the time of entry." Id. at 1225. Similarly, facts obtained post-search that validate the belief are not relevant to the analysis. Id. at 1226 n.3.

Based on the facts in the record, the court concludes that, even under the liberal standard, the officers did not have a reasonable belief that Mr. Lambrose resided at the house at the time they executed the arrest warrant or that he was there on the night of December 13, 2012.

Agent McIntyre initiated the entry one day after receiving the tips and without verifying the information received from the informants. The tips, individually or collectively, did not create a reasonable belief that Timothy Lambrose was residing at the West Jordan home. Without further investigation, no reasonable belief could have been formed.

The first tip, which contained second-hand and third-hand information, said that Mr. Lambrose was "possibly staying" at the house. This qualifying language reduced the value of the tip. Also, the first tip did not contain information about when the unidentified bondsman obtained the information. The information may well have been stale, particularly because it is common for fugitives to move around frequently.

The second tip came from an anonymous person, who would not be held accountable if the information was inaccurate or provided in bad faith. The information in that tip was also vague and qualified, as it said that if the "certain vehicle" was at the house, Mr. Lambrose "might be there." (Tr. at 47.) The "certain vehicle" was never described by make, model, color, year,

---

court declines to apply the "probable cause" standard here.

body style, condition, or any other details that would distinguish it from any other car. Agent McIntyre did not establish a link between the "certain vehicle" and Mr. Lambrose. She could easily have done a simple license plate check to determine the registered owner of the car. There were no tangible facts to support her belief. Yet the "certain vehicle" was the primary basis for believing that Mr. Lambrose was inside the house that night. The presence of a car in the driveway is not enough to provide reasonable belief that Mr. Lambrose was in the home. Also, Agent McIntyre did not establish a link between the house and Mr. Lambrose. See United States v. Werra, 638 F.3d 326, 338 (1st Cir. 2011) (lack of efforts to verify informant's information was unreasonable and entry to execute arrest warrant violated arrestee's Fourth Amendment rights).

The Government points to United States v. Gay to support its position. But that case is factually distinguishable. In Gay, the officers engaged in a face-to-face conversation with the informant, who personally accompanied them to the house. 240 F.3d at 1225. Here, Agent McIntyre was left with an uncorroborated anonymous tip and third-hand information.

"Although 'actual viewing of the suspect on the premises is not required,' the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present." Werra, 638 F.3d at 338-39 (quoting Valdez, 172 F.3d at 1226). There was nothing to validate the belief that the car in the driveway was in any way connected to Mr. Lambrose.

The surveillance did not reveal the presence of any person, let alone Mr. Lambrose. (The fact that lights were on in a house at a certain time does not by itself support a belief that a person is inside the house.) The officers did not have visual confirmation of an individual in the house until they had entered the backyard. Similarly, the first time Deputy Phelps spotted Mr. Lambrose was when he went into the backyard and looked through the sliding glass door. The

officers may not enter the curtilage and then develop their reasonable belief that Mr. Lambrose was present.

Given the lack of reasonable belief, the evidence was obtained in violation of Mr. Lambrose's Fourth Amendment rights, and so it must be suppressed.[8]

***Miranda* Warning and Use of Mr. Lambrose's Statements**

When Mr. Lambrose was taken to Officer Hughes' truck, he was undeniably in custody. Accordingly, the officers were required to give him a Miranda warning.[9] For the warning to be valid, each right must be reasonably conveyed to the suspect. Duckworth v. Egan, 492 U.S. 195, 203 (1989). But when Agent McIntyre administered the Miranda warning to Mr. Lambrose, she left out the crucial information that Mr. Lambrose had a right to have counsel present during questioning. "'The rule the Court established in Miranda is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning . . . of his right to have counsel . . . present during interrogation.'" United States v. Anthon, 648 F.2d 669, 673 (10th Cir. 1981) (quoting Fare v.

---

[8] The United States argues, with little analysis, that the court should not exclude the evidence because the good faith exception to the exclusionary rule applies. (See U.S.'s Opp'n Mem. (Docket No. 27) at 5.) The holdings of cases cited in the Government's opposition memorandum are very narrow. See Davis v. United States, 131 S. Ct. 2419 (2011) (declining to apply exclusionary rule to a search incident to arrest when Fourth Amendment violation occurred because police followed circuit precedent that was later overturned by the Supreme Court); Herring v. United States, 555 U.S. 135, 141 (2009) (holding that exclusionary rule did not apply to a search incident to arrest when the Fourth Amendment violation occurred due to a police record keeping error). See also Robert A. Lucas, Toward a General Good Faith Exception, 127 Harv. L. Rev. 773 (2013); Craig Bradley, Is the Exclusionary Rule Dead?, 102 J. of Crim. L. & Criminology 1 (2012). The court will not extend the exception to the exclusionary rule in this situation.

[9] See Miranda v. Arizona, 384 U.S. 436 (1966).

Michael C., 442 U.S. 707, 717 (1979)).

The Government concedes that the incomplete warning given to Mr. Lambrose forecloses its ability to use his statements against him during the Government's case-in-chief. But the Government asserts that the statements made by Mr. Lambrose were voluntarily given and so may be used for impeachment purposes, following the rule announced in Harris v. New York, 401 U.S. 222 (1971). In Harris, the United States Supreme Court held that statements obtained in violation of Miranda may be used to impeach the defendant's credibility on the stand if the statements were not coerced. United States v. Denetclaw, 96 F.3d 454, 457 (10th Cir. 1996).

The court does not have any evidence in the record describing the complete circumstances under which Mr. Lambrose gave his statements (for instance, Officer Hughes did not testify during the evidentiary hearing). Accordingly, the court cannot say with certainty (or at least by a preponderance of the evidence) that Mr. Lambrose's statements were voluntary. But this gap in the evidence does not foreclose the Government's use of the statements for impeachment purposes. Unless the defendant affirmatively challenges the voluntariness of his statements, the Government does not have the burden to establish through testimony that the statements were not coerced.

> If voluntariness is questioned, the Court has the constitutional duty to make a factual determination. . . . But in the absence of either an allegation or indication of coercion, duress or involuntariness we are not going to require the government, as a precondition to use of defendant's own statement to cross-examine him, to bring in the FBI agent who took the statement to testify affirmatively that there was no coercion and that the statement was voluntarily given.

United States v. Scott, 592 F.2d 1139, 1142 (10th Cir. 1979).

Mr. Lambrose challenges the admissibility of his statements during the government's

12

case-in-chief, but he does not argue that his statements were coerced.[10] Accordingly, the Government may use Mr. Lambrose's statements as impeachment if Mr. Lambrose testifies on his own behalf during trial.

## ORDER

For the foregoing reasons, Defendant Timothy Lambrose's Motion to Suppress (Docket No. 16) is GRANTED. However, the United States may use Mr. Lambrose's statements to impeach him at trial, if necessary.

DATED this 13th day of February, 2014.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge

---

[10]The court reads Mr. Lambrose's argument to be that the waiver was not, as a matter of fact and law, valid (i.e., without knowledge of all of his rights as an accused—including the right to have counsel present during questioning—he could not have knowingly waived those rights).